**Joseph R. HOWELL, Ph.D., Petitioner**

v.

**BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, STATE BOARD OF PSYCHOLOGY, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 14, 2011.

Decided Dec. 29, 2011.

---

Robert L. Byer, Pittsburgh, for petitioner.

Judith E.P. Schulder, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, and COHN JUBELIRER, Judge, and KELLEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Joseph R. Howell, Ph.D., petitions for review of the Final Adjudication and Order of the Bureau of Professional and Occupational Affairs (Bureau), State Board of Psychology (Board), in which the Board suspended Dr. Howell's license to practice psychology for nine months and ordered Dr. Howell to complete 15 hours of remedial training in boundary issues. The Board imposed this penalty on Dr. Howell upon finding that he had engaged in unprofessional or immoral conduct by hugging and kissing a former patient (E.R.) and seeking a romantic relationship with her thereafter. Dr. Howell argues that, because approximately four years elapsed between the time the Bureau completed its investigative report on E.R.'s complaint and the date it filed the Order to Show Cause against Dr. Howell, the Board's Final Adjudication and Order violates his right to due process and is barred by the doctrine of laches. In addition, Dr. Howell argues that this Court should establish a rebuttable presumption in the application of the doctrine of laches that any delay of more than two years between an alleged incidence of professional misconduct and the initiation of charges should be presumed to be dilatory on the part of a licensing board and prejudicial to the licensed professional.

E.R. began treating with Dr. Howell in approximately July, 2001. At that time, Dr. Howell maintained a private practice. Dr. Howell has since begun working as a school psychiatrist for the Gateway School District, although he still maintains a small private practice. Dr. Howell treated E.R. until approximately August 2003. This treatment took "the form of individual, in-person sessions, telephone conferences and e-mails." (Final Adjudication and Order, Findings of Fact (FOF) ¶ 11, July 22, 2010.) Dr. Howell "treated E.R. for social-phobic and disagreement issues and some adolescent drug behavior." (FOF ¶ 12.) During the course of E.R.'s treatment, she began attending college, but continued having sessions with Dr. Howell over the telephone. (FOF ¶ 15.)

During the last therapy session [in August, 2003, Dr. Howell] told E.R. that she made enough progress to stop seeing him but he would keep her on as a patient in case she needed to return for another session to address her anxiety and to stop by during a college break and let him know how she was doing.

(FOF ¶ 17.) E.R. contacted Dr. Howell on December 18, 2003, told him that she was coming to town, and wanted to update him on her progress; Dr. Howell and E.R. agreed to meet at Dr. Howell's office that afternoon. (FOF ¶¶ 18–19.) While they had previously met in a "well-lit room with a table and chairs," Dr. Howell directed E.R. to a "room with dim lighting and separate seats/couches." (FOF ¶ 20.) Dr. Howell offered to buy E.R. a drink, noted that she had lost weight, complimented her on her appearance, and invited E.R. to call him Joe. (FOF ¶ 21(a)-(b), (e)-(f).) At the end of the visit, Dr. Howell hugged E.R. with both arms and, when E.R. attempted to pull away, "kissed her hard on the lips with an open mouth." (FOF ¶¶ 22–23.) E.R. immediately left the building. (FOF ¶ 24.) Dr. Howell sent E.R. two emails: one on December 18, 2003 and one on December 25, 2003 at 9:35 p.m. (FOF ¶ 27.) The December 18, 2003 e-mail had the subject line "Re: just wanted to say hi," and stated in the body "Ms. R, It was

good to see you today. Give me a call once you have your work schedule. Dr. Howell." (FOF ¶ 28.) The December 25, 2003 e-mail had no subject heading and stated "E, Give me a call. Joe Howell." (FOF ¶ 29.) Dr. Howell also attempted to call E.R. two or three times on her cell phone, but she did not respond to any of his attempts to contact her. (FOF ¶¶ 31–32.)

E.R. filed a complaint regarding Dr. Howell with the Bureau on January 16, 2004. (FOF ¶ 33.) An investigator for the Bureau (Investigator) interviewed E.R. on March 10, 2004. (FOF ¶ 34.) Investigator interviewed Dr. Howell on March 31, 2004. (FOF ¶ 35.) Investigator completed his report on E.R.'s complaint on May 10, 2004. (FOF ¶ 36.) The Bureau subpoenaed Dr. Howell's records regarding his treatment of E.R. on February 25, 2005. (FOF ¶ 37.) In response to the subpoena, Dr. Howell provided "copies of billing records and copies of e-mails between" himself and E.R. on March 16, 2005, but did not provide office notes, reports, or tests. (FOF ¶ 38.) The Bureau filed an Order to Show Cause against Dr. Howell on March 6, 2007, for, *inter alia*, "failing to maintain professional records" relating to his failure to turn over records regarding E.R.'s treatment. (FOF ¶ 39.) The Board indefinitely suspended Dr. Howell's license on May 24, 2007, with the condition that the suspension would be lifted when Dr. Howell provided E.R.'s treatment records or Dr. Howell proved "to the Board's satisfaction that all recovery efforts [had] been exhausted and the" records were irretrievable. (FOF ¶ 40.) In a hearing to reinstate his license, Dr. Howell explained that he did not respond to the March 6, 2007, Order to Show Cause because he was unable to retrieve E.R.'s treatment records and thought he would only receive a fine.

(FOF ¶ 43.) The Board accepted that Dr. Howell had "exhausted all efforts to recover his lost records" and reinstated his license on May 7, 2008. (FOF ¶ 44.)

On April 24, 2008, the Bureau filed an Order to Show Cause against Dr. Howell relating to his interactions with E.R. in December, 2003. On June 2, 2008, Dr. Howell filed a Motion to Dismiss, arguing that the four-year delay between the completion of the investigative report into E.R.'s complaint and the filing of the Order to Show Cause based on that complaint violated Dr. Howell's right to due process and the doctrine of laches, in that the delay prejudiced his ability to defend himself because the passage of time made it more difficult or impossible to find witnesses who might have information regarding the incident. The Board heard oral argument on the Motion to Dismiss on October 6, 2008. On October 29, 2008, the Board issued an Order denying the Motion to Dismiss, but permitting Dr. Howell to raise the issue of laches at the substantive hearing on the Order to Show Cause.

■ After a hearing at which Dr. Howell and E.R. testified, the Board sustained three counts of unprofessional or immoral conduct in violation of the Professional Psychologists Practice Act,[1] the Board's regulations, and the American Psychological Association Standards, for engaging in sexual intimacies with E.R. by hugging and kissing her, and by attempting to form an intimate relationship with E.R. within two years of treating her. (Final Adjudication and Order, Conclusions of Law (COL) ¶¶ 3, 5–6, July 22, 2010.) The Board held that there was insufficient evidence to sustain two other counts of unprofessional conduct against Dr. Howell. (COL ¶¶ 4, 7.) In its discussion, the Board rejected Dr. Howell's argument regarding

---

1. Act of March 23, 1972, P.L. 136, *as amended*, 63 P.S. §§ 1201–1218.

laches on the grounds that Dr. Howell failed to show that the Bureau did not act with due diligence in bringing charges against Dr. Howell because the delay was caused, at least in part, by the Bureau's attempts to obtain Dr. Howell's treatment records regarding E.R. (Final Adjudication and Order at 15–17.) The Board also determined that Dr. Howell failed to show that he was prejudiced by the delay because he was put on notice that his conduct with E.R. was under investigation by his interview with Investigator and because there was no dispute that only Dr. Howell and E.R. were present during the interaction in his office on December 18, 2003. (Final Adjudication and Order at 16–17.) Finally, the Board held that Dr. Howell could not invoke the doctrine of laches because he came before the Board with unclean hands, having failed to timely respond to the Bureau's subpoena for E.R.'s records. (Final Adjudication and Order at 17.) Dr. Howell now petitions this Court for review.[2]

Before this Court, Dr. Howell argues that: (1) this Court should establish a rebuttable presumption that a two-year delay between the filing of professional licensing charges and the alleged conduct underlying the charges constitutes an undue delay that prejudices the licensed professional for purposes of the doctrine of laches; (2) the Board erred in holding that the charges against Dr. Howell were not barred by the doctrine of laches; and (3) the Bureau's delay in filing the Order to Show Cause against Dr. Howell violated his right to procedural due process.

 We first address Dr. Howell's argument that this Court should establish a rebuttable presumption that any delay of more than two years between the filing of professional licensing charges and the alleged conduct underlying the charges is an undue delay that prejudices the licensed professional for purposes of the doctrine of laches. Laches is an affirmative, equitable defense that may be asserted when: (1) "under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action"; and (2) "the opposing party's position or rights [are] prejudiced as a result of that delay." *Weinberg v. State Board of Examiners of Public Accountants,* 509 Pa. 143, 148, 501 A.2d 239, 242 (1985) (quoting *Class of Two Hundred Administrative Faculty Members v. Scanlon,* 502 Pa. 275, 279, 466 A.2d 103, 105 (1983)). The defense of laches may be asserted against a disciplinary action by a state licensing board. *Id.* at 149–51, 501 A.2d at 243–44. Because laches is an affirmative defense, the burden of proving the above elements is on the party asserting laches as a defense. *Id.* at 148, 501 A.2d at 242. In addition, a defendant or respondent attempting to assert the defense of laches against the Commonwealth bears a heavier burden than one who attempts to assert the defense against a private person. *Krystal Jeep Eagle, Inc. v. Bureau of Professional and Occupational Affairs, State Board of Vehicle Manufacturers, Dealers and Salespersons,* 725 A.2d 846, 850 (Pa. Cmwlth.1999) (citing *Weinberg* ).

This Court declines to adopt the presumption advocated by Dr. Howell. In *Kindle v. State Board of Nurse Examiners, Bureau of Professional and Occupational Affairs, Department of State,* 86 Pa.Cmwlth. 468, 485 A.2d 534 (1984) (*Kindle I* ), *rev'd* 512 Pa. 44, 515 A.2d 1342

**2.** "This Court's scope of review is limited to determining whether there has been a violation of constitutional rights, errors of law were committed, or whether findings of fact are supported by substantial evidence." *Bethea–Tumani v. Bureau of Professional and Occupational Affairs, State Board of Nursing,* 993 A.2d 921, 925 n. 6 (Pa.Cmwlth.2010).

(1986) (*Kindle II*), this Court held that a four-year delay between a nurse's misconduct and the imposition of discipline "is excessive and prejudicial per se." *Kindle I*, 485 A.2d at 535. In addition, this Court urged "that some statutory limitation be required with which the [State Board of Nurse Examiners] must hold hearings and issue adjudications." *Id.* The Supreme Court, in *Kindle II*, reversed this Court. The majority opinion held that:

> the Commonwealth Court erred when it adopted a per se rule of prejudice based solely upon the length of time between the misconduct and the license suspension.
>
> . . . .
>
> The Commonwealth Court's holding understandably was engendered by frustration and a genuine concern for the extensive delays in administrative adjudications of the actions. Nevertheless, the practical effect of its holding was to create a statute of limitations, an effort properly left to the Legislature.

*Kindle II*, 512 Pa. at 49, 515 A.2d at 1345. Justice Papadakos, while concurring in the majority opinion, wrote a separate concurring opinion in which he stated that it was not improper of this Court to impose a per se *rebuttable presumption* that the four-year delay prejudiced the licensee. *Id.* at 54–55, 515 A.2d at 1347–48 (Papadakos, J., concurring). Thus, in Kindle II, the Supreme Court considered and rejected exactly the sort of rebuttable presumption Dr. Howell asks this Court to adopt. Given this precedent, this Court will not adopt a standard that the Pennsylvania Supreme Court has already considered and declined to adopt.

■ We next address Dr. Howell's argument that the Board erred in holding that the charges against Dr. Howell were not barred by the doctrine of laches. As discussed above, in order to show that licensure charges should be barred by the doctrine of laches, the licensee must show that the Board did not act with due diligence in bringing charges and that the licensee was prejudiced by the delay. Dr. Howell argues that the Bureau was not diligent in pursuing the charges against him with regard to his conduct at his meeting with E.R. on December 18, 2003, because approximately four years elapsed between the time Investigator completed his report and the date the Bureau filed the Order to Show Cause. The Board argues that this delay was due, at least in part, to the fact that it was attempting to obtain E.R.'s treatment records from Dr. Howell in order to determine whether additional charges were warranted. While Dr. Howell asserts that he informed both Investigator and the Board's prosecutor in 2005 that the records were irretrievable, the record does not reflect this.

As noted above, in the course of its investigation into E.R.'s complaint, the Board subpoenaed Dr. Howell's treatment records for E.R. and suspended his license in an attempt to compel him to produce them when he failed to provide complete records. (FOF ¶¶ 37–41.) Dr. Howell failed to respond to the Order to Show Cause regarding his failure to produce the records or the Bureau's Motion to Deem Facts Admitted in the matter. (Final Adjudication and Order, Findings of Fact ¶ 12, May 24, 2007, Supp. R. Item 6.) In the May 7, 2008 Final Adjudication and Order, in which the Board restored Dr. Howell's license upon determining that he had done all in his power to retrieve E.R.'s treatment records, the Board found that "[w]hen contacted by the Commonwealth about the records, [Dr. Howell] informed the investigator and left messages for the prosecuting attorney advising that all of his notes were in his computer and that he was unable to retrieve the records." (Fi-

nal Adjudication and Order, Findings of Fact ¶16, May 7, 2008, Supp. R. Item 15.)[3] However, the Board also found that *"[i]n preparing for the hearing,* [Dr. Howell] learned from [a representative from Hewlett Packard (HP) ] that there was no guarantee that HP would be able to recover the information on the damaged drive." (Final Adjudication and Order, Findings of Fact ¶10, May 7, 2008, Supp. R. Item 15 (emphasis added).) Therefore, drawing all inferences from the record in favor of the party prevailing below, it appears that while Dr. Howell may have informed the Investigator and the Bureau's prosecutor that he was not in possession of E.R.'s treatment records and had not been able to recover them, it was not until the hearing on Dr. Howell's petition to reinstate his license, or shortly before, that Dr. Howell himself learned that the records were truly irretrievable. While Dr. Howell argues that E.R.'s treatment records were unnecessary or irrelevant to the charges relating to his conduct on December 18, 2003, it was a reasonable exercise of prosecutorial discretion for the Bureau to wish to examine these records to determine whether Dr. Howell's conduct during E.R.'s treatment met professional standards, given the allegations against him. Dr. Howell bears a heavy burden of proving dilatory conduct on the part of the Bureau. Without imputing any bad faith to Dr. Howell, the record reflects that he contributed to the delay in the Board's final determination that the treatment records regarding E.R. were irretrievable, for example, by not responding to the Order to Show Cause regarding his failure to produce the records or the Bureau's Motion to Deem Facts Admitted. Therefore, this Court holds that the delay was not

due to a lack of due diligence on the part of the Bureau. Thus, Dr. Howell's argument that the Board should have found that the charges against him were barred by the doctrine of laches fails.

Even were we to hold that the delay was caused by a lack of diligence on the part of the Bureau, Dr. Howell failed to show that the delay caused him prejudice. Dr. Howell argues that, had he known of the charges sooner, he might have been able to find witnesses who observed himself or E.R. following their meeting, or he might have been able to produce additional records, e-mails, or phone records. These arguments are unavailing. As the Board points out, Dr. Howell's computer crashed in December 2003, before E.R. had even filed her complaint, and within weeks of their meeting. Similarly, Dr. Howell supplied relevant emails to the Bureau's Investigator and does not point to any specific material that he would have produced, but has since become unavailable. Likewise, Dr. Howell's argument that he might have been able to find witnesses is hypothetical. There is no reason to believe that Dr. Howell would have been able to locate witnesses to the aftermath of his meeting with E.R. if the Bureau had filed its Order to Show Cause any earlier than it had, e.g., eighteen months after the Bureau completed its investigation rather than four years thereafter. With only speculative harm, Dr. Howell has failed to make the substantial showing of prejudice necessary to sustain a defense of laches against the Bureau.

██ Finally, we address Dr. Howell's argument that he was denied substantive due process by the Bureau's failure to file

---

**3.** The parties stipulated, and the Board's counsel agreed, that the record of the Board's disciplinary action against Dr. Howell for failing to provide E.R.'s treatment records in response to the subpoena should be made part of the record in the current case. (Amended Hr'g Tr. at 17–19, R.R. at R.090a.)

charges against him sooner than it did. In essence, Dr. Howell argues that timely notice is an essential element of substantive due process. This does not mean, however, that delay in notice necessarily violates the right to timely notice. Rather, timely notice for purposes of procedural due process means that notice sufficiently precedes a hearing so as to give the accused enough time to prepare a defense. *See, e.g., Pennsylvania Coal Mining Association v. Insurance Department,* 471 Pa. 437, 452, 370 A.2d 685, 692–93 (1977) ("[n]otice should be *reasonably calculated to inform interested parties of the pending action,* and the information necessary to provide an opportunity to present objections" (emphasis added)). While Dr. Howell's arguments regarding the timing of the Order to Show Cause are germane to his laches argument, they are not germane to an argument regarding due process. Although Dr. Howell complains that he did not receive the Order to Show Cause soon enough to allow him to prepare an optimal defense, he does not argue that the Order to Show Cause did not provide him with sufficient notice of the charges against him or sufficient time before his administrative hearing to make objections or prepare a defense. Therefore, we reject this argument.

For these reasons, we affirm the Final Adjudication and Order of the Board.

### ORDER

**NOW,** December 29, 2011, the Final Adjudication and Order of the Bureau of Professional and Occupational Affairs, State Board of Psychology, in the above-captioned matter is hereby **AFFIRMED.**